**SO ORDERED.**

**SIGNED this 3rd day of August, 2023.**



_____
Mitchell L. Herren
United States Bankruptcy Judge

**DESIGNATED FOR ONLINE PUBLICATION ONLY**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF KANSAS**

| | |
|---|---|
| IN RE:<br><br>ANDOVER SENIOR CARE, LLC,<br><br>Debtor. | Case No. 22-10139<br>Chapter 11 |

**ORDER APPROVING DEBTOR'S FOURTH AMENDED DISCLOSURE STATEMENT DATED APRIL 13, 2023 (Doc. 294) AND CONFIRMING AS MODIFIED DEBTOR'S THIRD AMENDED CHAPTER 11 PLAN OF <u>REORGANIZATION DATED APRIL 13, 2023 (Doc. 293)</u>**

On June 13, 2023, this matter came before the Court for the combined evidentiary hearing on the Debtor's Fourth Amended Disclosure Statement (Doc. 294) and Debtor's Third Amended Chapter 11 Plan of Reorganization dated April

1

13, 2023 (Doc. 293).[1] This Chapter 11 case boils down to a two-party dispute between the debtor and creditor HUD, which timely elected § 1111(b) treatment. The unresolved issue(s) remaining between the parties mostly pertain to whether certain obligations of the debtor and rights of HUD under the parties' Regulatory Agreements must be incorporated in debtor's plan, or whether they may be modified or eliminated.

The Court conducted a final hearing on the Fourth Amended Disclosure Statement which the Court conditionally approved on April 20, 2023. No objections to the Fourth Amended Disclosure Statement were filed. Having reviewed the same, the Court approves the Fourth Amended Disclosure Statement on a final basis as containing adequate information pursuant to § 1125(a).

The Court proceeded to an evidentiary hearing on confirmation of the debtor's Third Amended Plan. Debtor duly served its Third Amended Plan on creditors and parties in interest of record, together with ballot forms and this Court's Order and Combined Notice to Creditors and Parties in Interest in a Chapter 11 Case dated April 24, 2023.[2]

The certificate of voting represents that Class 1 (HUD) did not vote on the Third Amended Plan.[3] Likewise, neither Class 4 (Unsecured Priority Claim of

---

[1] Attorneys Mark J. Lazzo and Justin Balbierz appeared for debtor Andover Senior Care, LLC. Assistant United States Attorneys Sarah Macke and Brian Sheern appeared for creditor U.S. Department of Housing & Urban Development (HUD). Richard A. Kear appeared for the United States Trustee.
[2] Doc. 301, Debtor's Certificate of Service dated April 24, 2023.
[3] Doc. 315.

Kansas Department for Aging and Disability Services (KDADS)),[4] nor Class 5 (Unsecured Post-Petition Administrative Claim of HRSA [U.S. Department of Health & Human Services, Health Resources & Services Administration]) returned a ballot on the Third Amended Plan. Classes 2 and 3 —impaired secured claims of Commerce Bank and Huntington National Bank, accepted the Third Amended Plan. With these acceptances, the debtor has satisfied the "one impaired accepting class" requirement of § 1129(a)(10), to proceed to cramdown confirmation under § 1129(b). Class 6 consisting of general unsecured creditors had one accepting creditor; no other unsecured creditors in Class 6 voted.

HUD's predecessor timely elected § 1111(b) treatment as a fully secured non-recourse creditor. Though HUD did not cast a ballot on the Third Amended Plan, it did file an objection to confirmation "to the extent it seeks to modify Debtor's regulatory obligations."[5] There were no other objections filed to the Third Amended Plan.[6] At the time of the confirmation hearing, HUD and debtor had resolved most all of the objections to confirmation except for the issues addressed and determined below.

Factual Background

Highly summarized, debtor owned and operated prepetition two residential health care facilities on separate parcels of real estate—a skilled nursing facility

---

[4] KDADS's claim was disallowed as a priority claim. *See* Docs. 235, 246.
[5] Doc. 306.
[6] The U.S. Department of Health and Human Services (HHS) filed an objection on behalf of its unsecured creditor agencies HRSA and CMS ([Centers for Medicare and Medicaid Services], doc. 273, to Debtor's Second Amended Plan, doc. 264, but withdrew that objection on April 11, 2023, doc. 292, before the Third Amended Plan was filed.

3

built in 2010 (SNF) and an assisted living facility built in 2004 (ALF).[7] In March of 2020, Debtor refinanced approximately $14 million through HUD's § 232 program available for residential care facilities such as nursing homes and assisted living facilities under the National Housing Act. Under the program HUD-approved lenders are insured against loss on mortgage defaults; the lender here was Dwight Capital, LLC, which assigned its claim to HUD during the pendency of debtor's bankruptcy case. As part of the HUD loan documentation, and in addition to granting a first security interest and mortgage in all of debtor's assets (except for two vehicles that were secured to other creditors),[8] debtor was required to execute two regulatory agreements, Regulatory Agreement-Borrower (Reg. A-B) and Regulatory Agreement-Operator (Reg. A-O). It is compliance with those Regulatory Agreements that remains at issue.

Shortly before filing this Chapter 11 case on March 11, 2022, debtor, in coordination with the Kansas Department of Aging, closed the SNF due to unprofitability occasioned by increased operational costs imposed during the COVID pandemic and skilled nursing staff shortages. Debtor continues to operate the profitable ALF and proposed a plan of reorganization to restructure its debt obligations. As part of its plan, Debtor proposed to sell the SNF facility and certain personal property pursuant to § 363(f) and apply the net sale proceeds to HUD's claim. The Court approved debtor's motion for sale #3 to effectuate that sale, after

---

[7] Debtor is owned by Dennis and Debie Bush.
[8] Class 2 Secured claim of Commerce Bank and Class 3 Secure claim of Huntington National Bank, both of which are impaired.

the first two sale attempts fell through.[9]

The Third Amended Plan, Article III, Class 1 provides for treatment of HUD's secured claim in the amount of $13,922,514.[10] It has three basic components to pay HUD's secured claim in full: sale of the SNF with estimated net proceeds of $1,730,000 to be applied to HUD's claim;[11] certain previously maintained escrow accounts under the loan documents, save the replacement reserve escrow, in the approximate amount of $1,263,420 to be credited against HUD's claim;[12] and monthly payments from ALF operating revenue of $26,023.81 over a 35-year term on the remaining balance of HUD's claim, estimated at $10,930,00 after reduction for the SNF sale proceeds and escrow balances, together with a $500 monthly payment for HUD's outside loan servicer.[13]

Debtor proposed to retain and maintain a $100,000 replacement reserve escrow, instead of the $316,413.90 that existed on the date of filing. It provided a sliding scale for replenishing the replacement reserve when it fell below $100,000, depending on the amount advanced from the replacement reserve. Debtor would discontinue funding the other reserve/escrow accounts.[14]

Finally, debtor enumerated several provisions of the Regulatory Agreements that would be eliminated or modified by the Third Amended Plan or confirmation

---

[9] Doc. 296. The SNF was sold for a sales price of $1,925,000 and the plan estimated net sales proceeds of $1,730,000 will be credited against HUD's claim.
[10] Doc. 293, pp. 5-9.
[11] *Id.* at p. 6.
[12] *Id.* at pp. 5-6.
[13] *Id.* at pp. 6-7.
[14] *Id.* at pp. 7-8.

5

order, for which debtor's noncompliance would not constitute an event of default.[15]

Analysis

As relevant here, debtor must meet the confirmation standards in § 1129(a), except for § 1129(a)(8), plus § 1129(b)(1) which requires that the plan does not discriminate unfairly and is fair and equitable with respect to secured creditor HUD's Class 1 claim. Section 1129(b)(2)(A) requires that the holder of a secured claim retains the liens securing the claim to the extent of the allowed amount of the claim;[16] and that the holder of the secured claim receives deferred cash payments totaling at least the allowed amount of the secured claim, of a value, as of the effective date of the plan, of at least the value of the holder's interest in the estate's interest in such property,[17] for a plan to be fair and equitable. When a creditor elects § 1111(b) treatment, debtor must pay a stream of payments that have a present value equal to the value of the creditor's collateral, and the total amount of the creditor's stream of payments must equal the amount of the creditor's debt.[18] HUD does not contend that debtor's Third Amended Plan fails to comply with these standards and the Court finds that the Third Amended Plan does not unfairly discriminate against HUD and is fair and equitable under § 1129(b)(1), subject to the Court's findings below on the disputed regulatory provisions.

HUD argues that certain obligations and rights in the Regulatory

---

[15] *Id.* at pp. 8-9.
[16] Section 1129(b)(2)(A)(i)(I).
[17] Section 1129(b)(2)(A)(i)(II).
[18] *See In re Topp's Mechanical, Inc.,* No. BK21-40038-TLS, 2021 WL 5496560, at *3 (Bankr. D. Neb. Nov. 23, 2021). Debtor must also satisfy § 1129(a)(7)(B).

6

Agreements must be incorporated in the Third Amended Plan and cannot be extinguished or modified by a Chapter 11 debtor in bankruptcy, citing *In re Capital W. Investors*.[19] Debtor, citing *In re Water Gap Village*,[20] argues that HUD, a government agency with the status of a secured creditor, has no plenary authority that exempts it or overrides the Bankruptcy Code and that HUD is subject to the bankruptcy court's authority to cram down debtor's plan under § 1129. In the Court's view, it has discretion to evaluate the regulatory requirements in the context of confirmation of this debtor's Third Amended Plan. The Court balances the equities when weighing the regulatory requirements and public policy of the § 232 program of the National Housing Act against the goals and public policy of the Bankruptcy Code and a Chapter 11 reorganization.

1. *Unilateral Removal of Operator of ALF, § 26(d) of Reg. A – B*

Section 26(d) of Reg. A-B provides:

> In the event that Borrower [Andover Senior Care, LLC] is itself the licensed operator of the Healthcare Facility and HUD determines that (i) any of the Permits and Approvals have been or are at substantial and imminent risk of being terminated, suspended or otherwise restricted in such a way that the Project [ALF] could not be operated for the Approved Use, as evidenced by, without limitation, letters of warning or imposition of penalties from applicable state and/or federal regulatory and/or funding agencies, or (ii) the financial viability of the Healthcare Facility is at substantial and imminent risk, then, pursuant to Program Obligations and without prejudice to any enforcement actions otherwise set forth in this Agreement, HUD may direct Borrower to retain the services of an operator acceptable to HUD. Upon such

---

[19] 186 B.R. 497 (N.D. Cal. 1995) (bankruptcy court's confirmation of chapter 11 plan that removed certain provisions of HUD regulatory agreement was error because the bankruptcy court did not balance the goals and public policy of National Housing Act against goals and public policy of Chapter 11 bankruptcy).
[20] 59 B.R. 23 (Bankr. D. N.J. 1985).

7

direction from HUD, Borrower shall expeditiously do so.[21]

This provision of the regulatory agreement is reasonable, with modifications to be discussed below, to include in the Third Amended Plan to protect HUD from debtor's potential inability to operate the ALF, or if the financial viability of the ALF becomes at "substantial and imminent risk."[22]

Balancing the policies of the National Housing Act and the Bankruptcy Code, the Court determines that HUD may invoke and seek relief under § 26(d) for good cause. The bankruptcy court retains jurisdiction to determine relief under § 26(d) and to determine whether good cause is established. But, in modification of the normal § 26(d) process, debtor must be given written notice and an opportunity to contest HUD's removal of debtor as operator. If contested, the Court will convene an evidentiary hearing and HUD will have the burden of proving that good cause exists for replacement of the debtor as operator. The Court declines HUD's request to require debtor to obtain a stay of action under § 26(d) or other injunctive relief pending a determination of the § 26(d) issue. The Court does not at this time define "good cause" for purposes of replacing the operator of the ALF, but may consider the nonexclusive list of "cause" under § 1112(b)(4) as well as the criteria for replacement in § 26(d) itself.

---

[21] Exhibit D, pp. 20-21.
[22] The Court notes that similar protections are available to a secured creditor under the Bankruptcy Code where the debtor-in-possession commits gross mismanagement of the estate. *See* § 1112(b)(1) (dismissal or conversion of chapter 11 case for "cause," including gross mismanagement of the estate, § 1112(b)(4)(B)). Section 1112(b)(1) further provides that in lieu of dismissal or conversion to chapter 7, the Court may determine that removal of the debtor-in-possession and appointment of a trustee under § 1104(a) is in the best interests of creditors and the estate.

8

## 2. *Replacement Reserve Escrow Balance*

Under the Third Amended Plan, debtor will maintain a replacement reserve escrow. The parties disagree at what level that replacement reserve escrow account must be maintained. Pursuant to subsequent negotiations between debtor and HUD after the filing of the Third Amended Plan, debtor agreed to maintain the replacement reserve escrow at its current level of $321,250.77. If debtor uses funds from the replacement reserve to pay for a major property replacement expenditure, it must replenish the account to the current level. As set out in the Reg. A-B, the purpose of the Replacement Reserve is to cover "costs for replacing major structural elements and mechanical equipment of the Project *or for any other purpose*."[23]

The remaining sticking point, however, is whether the ALF will be subject to a PCNA (Physical and Capital Needs Assessment) review and report obtained by HUD, the cost of which may be paid from the Replacement Reserve escrow, every ten years, starting in 2029. HUD may unilaterally require, "in its sole discretion," an increase in the replacement reserve that would trigger an additional monthly escrow payment obligation by debtor until the new reserve amount is met.[24] Debtor has no right under the regulatory agreement to contest the PCNA assessment or HUD's unilateral right to increase the replacement reserve.

Regarding the replacement reserve, the Reg. A -B provides at § 13(b):

> . . . At least every ten years, starting 5-21-2029, and more frequently at

---

[23] Ex. D, p. 10, § 13(a) (Emphasis added).
[24] As noted in HUD's objection to confirmation, the current monthly replacement reserve escrow payment of $5,354.18 is automatically suspended so long as the escrow balance is maintained at $321,250.77 (an amount equal to or greater than 60 months of the escrow payment). *See* Doc. 306, pp. 7-8.

9

> HUD's discretion, Borrower shall submit to HUD a written analysis of its use of the Reserve for Replacement during the prior ten years and the projected use of the Reserve for Replacement funds during the coming ten years in accordance with Program Obligations. The amount of the monthly deposit may be increased or decreased from time to time at the written direction of HUD without a recorded amendment to this Agreement. *In connection therewith, every ten years starting 5-21-2029, the Lender shall obtain a physical and capital needs assessment report for HUD to evaluate. The cost of such report may be paid from the Reserve for Replacements. HUD may, in its sole discretion, require Borrower to maintain a minimum balance in the account, in an amount to be set by HUD.*[25]

Debtor's argument that the PCNA is unnecessary is two-fold: (1) the current $321,250 reserve balance is sufficient to cover any major replacement expenses in the distant future;[26] and (2) debtor recently replaced its two major expenditures prepetition – replacing the ALF roof in 2020 or 2021 and repaving its parking lot in 2021. The roof replacement came with a 35-year warranty and cost $316,000, with approximately sixty percent of the cost paid by debtor's property insurance on the ALF. The cost to repave the parking lot was $20,000; debtor repaves the lot every five years, budgets for that expense, and pays the expense out of its operating revenue.

The ALF is an approximate 66,000 square foot facility with 88 living units, each with exterior doors. The living units have a full-size bathroom, refrigerator, stove, and microwave. The ALF has a commercial kitchen and dining area. The laundry room is used nearly exclusively by staff. The facility has four water heaters and four central air units for common areas. Debtor's principal estimated a cost of

---

[25] Exhibit D, p. 10 (Emphasis added).
[26] The Court notes that under the Third Amended Plan, HUD's claim will be paid in full by monthly payments over 35 years.

10

$5,000 to replace each central air unit. The living units have window units (less expensive than central air) that are replaced on an ongoing basis from operating revenue and debtor repaints and replaces carpet in a living unit when a resident moves out. In short, there was no evidence that debtor currently uses the replacement reserve to replace the HVAC systems, equipment, appliances, and maintain the living units.

The debtor's argument might carry more weight if the Court was evaluating the replacement reserve over the next ten or fifteen-year period. But there are many unknowns looking beyond that. Replacement costs are likely to be higher in the future, as well as operating costs. The useful life of appliances and HVAC systems are unlikely to extend for the life of this plan. In the Court's view and considering a HUD repayment term of 35 years ending in the year 2058, it is prudent to periodically evaluate the property securing HUD's claim and consider the then-current environment of operating assisted living facilities. Every ten years is a reasonable period for such review. Thus, the Court agrees with HUD, that the PCNA review and report process in § 13(b) of Reg. A-B should remain in place and be incorporated in the Third Amended Plan. That means that the minimum Replacement Reserve escrow account and monthly escrow payment may be subject to increase by HUD.

3. *Retention of Enforcement Action for Pre-petition Regulatory Violations*

This issue started out as a request by HUD in its objection to confirmation "that language be added to the Confirmation Order that specifically recognizes that

11

the Plan does not preclude or impact in any way HUD's enforcement rights regarding Debtor and/or its owners' pre- or post-petition violations [of the Regulatory Agreements or loan obligations], including those relating to shuttering the Skilled Nursing Facility."[27] The debtor objected to this "ability to sue" language, construing HUD's request as authorization to pursue *in personam* remedies against debtor outside of bankruptcy court for pre-petition loan defaults. At the confirmation hearing, HUD waived this objection to confirmation, conceding that the enforcement issue was premature.

The Court agrees that this is premature as no such "enforcement action" is before this Court. The Court concludes that the Third Amended Plan and confirmation order may reserve bankruptcy court jurisdiction to enforce and interpret the confirmed plan and confirmation order, to issue any order necessary to carry out the confirmed plan, to modify the plan under § 1127(b), to rule on allowance of claims, and to rule on allowance and payment of administrative expenses not previously allowed. The bankruptcy court has no intent or authority to modify § 1141 or § 101(5) and (12). To be clear, this Court is not reserving any right to HUD that is not recognized by the Bankruptcy Code.

    4. *Credit for $62,714 Escrow Balance for MIP (Mortgage Insurance Premium)*

Under the loan documents, debtor was obligated to make monthly deposits into several escrow accounts, including a MIP escrow to fund annual mortgage insurance premiums based on debtor's participation in a government-insured loan

---

[27] Doc. 306, p. 13, ¶ 25.

program under the National Housing Act. Those escrow accounts are held by and secured to HUD. As represented in lender Dwight's objection to debtor's cash collateral motion, the MIP Escrow contained some $62,714.57 as of the date of the petition and constitutes HUD's cash collateral.[28] The Court rejected Dwight's request requiring debtor to continue funding the MIP escrow account going forward.[29]

At the confirmation hearing, HUD argued that the MIP escrow funds transferred to it by Dwight were not property of the estate. Debtor argued that the funds should be applied to its outstanding debt owed to HUD as HUD did with other escrow account funds.[30]

The Court concludes that the MIP escrow funds are property of the estate and that debtor is entitled to a credit against HUD's claim in the amount of the MIP escrow - $62,714,57. The Court sees no valid distinction in treatment of the MIP escrow balance from application of other escrow balances against HUD's claim. In order to constitute cash collateral, cash or cash equivalents must necessarily be property of the estate.[31] There is no doubt that the MIP escrow funds are cash or

---

[28] Doc. 21, p. 6.
[29] Doc. 85. The Court reaffirmed that ruling in the Third Interim Order authorizing use of cash collateral. *See* Doc. 139 and 140.
[30] Doc. 293, pp. 5-6 (Art. III, Treatment of Class 1 Secured Claim of HUD, ¶ A, crediting Debtor's Escrow Funds against HUD's claim).
[31] *See* § 363(a) (defining cash collateral as cash or cash equivalents, including proceeds and profits of property); *In re 1518 West Chicago Ave., LLC,* 427 B.R. 439, 445 (Bankr. N.D. Ill. 2010) (rejecting lender's argument that rents collected by a receiver were not property of the estate); *In re Bryant Manor, LLC,* 422 B.R. 278 (Bankr. D. Kan. 2010) (assigned rents are property of bankruptcy estate and cash collateral; after paying ongoing business expenses related to the property, any profits from the rents must be used to pay down the debt owed by debtor).

13

cash equivalents. The MIP escrow was funded by debtor's operating revenue from the ALF. Property of the estate includes proceeds and profits from property of the estate.[32] The MIP escrow balance shall be applied to HUD's claim.

    5. *Modifications to the Third Amended Plan*

Having addressed and ruled on the outstanding regulatory and escrow issues raised by HUD's objection to confirmation, and after reviewing the issues negotiated and resolved by agreement of the parties, the Court approves and incorporates the modifications to the Third Amended Plan, including HUD's treatment in Class 1, as set forth below.[33] Except as modified and supplemented below, the terms and provisions of the Third Amended Plan remain in effect as filed.

    **(a)    Article III, Class 1 of the Third Amended Plan is stricken and replaced by the following:**

**CLASS 1    <u>Secured Claim of HUD by assignment from Dwight Capital, LLC.</u>**

After the Filing Date, Dwight assigned its claims herein to HUD. HUD's claim against Debtor is secured by a first mortgage lien in Tracts 1 and 2, a perfected security interest in all of Debtor's personal property except: (a) that personal property which is Collateral for the Class 2 claim of Commerce or the Class 3 claim of HNB; and (b) funds in Debtor's DIP accounts to the extent said funds exceed the amount of HUD's replacement lien granted per the Cash Collateral Order.

HUD, through Dwight, filed its election to be treated as a fully secured non-recourse creditor under 11 U.S.C. §1111(b). The unpaid principal and interest owed HUD, as of the Filing Date, was $13,922,514 (the "HUD Claim"). The HUD Claim will be paid in full as follows:

---

[32] *See* 11 U.S.C. § 541(a)(6) (including in property of the estate proceeds, rents, and profits from property of the estate).
[33] The modifications negotiated between debtor and HUD are presented here largely without substantive change by the Court, save for ¶ E.(f) of Article III, Class 1. There are also minor, clarifying edits that do not alter the parties' agreed-upon modifications. For example, the Court clarified that references to exhibits attached to the confirmation order has been changed to attachments to the Third Amended Plan, because those exhibits were previously filed with the Third Amended Plan. *See* Article III, Class 1 at ¶ C (cash flow and amortization schedule exhibits).

14

A. **Application of Debtor's MIP Escrow and Payment Reserve Escrow.**

As of the Filing Date, Dwight Capital held in escrow the following funds of Debtor: (a) MIP escrow - $62,714.57; and (b) payment reserve escrow - $858,294.92. These escrows, totaling $921,009.49, shall be retained by HUD and credited against the HUD Claim.

B. **Application of Net Proceeds from Sale of Tract 1 and Personal Property not Retained.**

Per Notice of Intended Sale #3 filed herein on March 22, 2023 (Dkt. 283)("Notice of Sale #3"), Debtor sold Tract 1 and the personal property described in the Notice to buyer NAT Capital, LLC. The net sale proceeds from the sale of Tract 1 and personal property totaled $1,682,479.51 (the "Auction Proceeds"), were paid over to HUD, and shall be credited against the HUD Claim.

C. **Payment of balance of HUD Claim.**

After crediting Debtor's Escrow Funds and the Auction Proceeds, the balance of the HUD claim is $11,319,025 (the "Remaining HUD Claim"). The Remaining HUD Claim will be paid without interest and in full in equal monthly payments of $26,950.06. An illustrative payment amortization schedule of HUD's Class 1 claim is attached to the Third Amended Plan as Exhibit 2. In addition to these payments, Debtor shall pay HUD a monthly amount of $500 to pay HUD's outside loan servicer.

Debtor's monthly payments shall begin thirty (30) days from the Effective Date. HUD shall retain its lien in its Collateral being retained by Debtor (the "Retained Collateral") until full payment of the HUD Claim.

The payments to HUD will total the amount of the Remaining HUD Claim. In addition, the payments satisfy 11 U.S.C. §1129(b)(2)(A)(i)(II) as they allow HUD to receive the present value of its interest in the Retained Collateral at the contractual interest rate of 3.75% per annum amortized over a term of term of thirty-five (35) years and appreciation in the value of the Retained Collateral of 4% per annum.

In addition to the monthly payment on the Remaining HUD Claim, Debtor will pay HUD a monthly payment equal to 1/12 of the annual ad valorem taxes accruing on the real estate being retained by Debtor. This payment shall be escrowed by HUD and used to pay the ongoing ad valorem taxes as they become due.

Debtor will pay directly, out of operating revenues, ongoing expenses for property insurance, repairs and replacements as set forth in Debtor's cash flow projections attached to the Third Amended Plan as Exhibit 3. Debtor will no longer fund escrow/reserve accounts except for: (a) ad valorem taxes as set forth above; and (b) replacement reserves as set forth at (D) below.

D. **Replacement Reserve Escrow.**

On the Filing Date, Debtor's replacement reserve escrow (the "replacement reserve escrow") held by HUD was $316,413.90, and the monthly replacement reserve payment (the "replacement reserve monthly payment") was set at $9,053.

15

The replacement reserve escrow shall be increased to $321,250.77 and shall at all times be held by HUD in an interest-bearing account on Debtor's behalf for needed repairs and replacements to Debtor's property.

The replacement reserve monthly payment is modified from $9,053 to $5,354.18 and such payment is suspended so long as a balance of $321,250.77 is maintained in the replacement reserve escrow until such time as a new physical and capital needs assessment report (the "PCNA Report") is prepared. At the time the new PCNA Report is prepared, the replacement reserve escrow may be increased or decreased depending upon the findings in the PCNA Report.

### E. Terms of HUD Regulatory Agreement.

Unless modified by, or contrary to, the terms of this Third Amended Plan or the Order Confirming Plan, the Debtor shall comply with the terms of the "HUD Regulatory Agreement – Borrower" and "HUD Regulatory Agreement – Operator." This Plan does not modify Bankruptcy Code § 1141, § 101(5), or § 101(12) and does not reserve any pre-petition claim of HUD against Debtor that is not recognized by the Plan, the Bankruptcy Code or applicable law.

Notwithstanding any terms in the "HUD Regulatory Agreement – Borrower" or "HUD Regulatory Agreement – Operator" to the contrary, it shall not be a default under this Plan for the following acts by Debtor:

(a) allowing its SNF license to lapse due to its closure of the SNF;
(b) conducting a § 363 sale of Tract 1 and the personal property located therein as part of its downsizing Plan;
(c) no longer funding escrow/reserve accounts for residual receipts, property insurance, MIP premiums, and long-term debt service;
(d) funding Debtor's "replacement reserve" escrow account as described in this Plan;
(e) not maintaining a specified level of debt service coverage as set out at ¶6(a)(ii) of the "HUD Regulatory Agreement – Operator"; and
(f) contesting a written directive by HUD that Debtor retain the services of a substitute operator acceptable to HUD per ¶ 26(d) of the "HUD Regulatory Agreement – Borrower" as provided herein. If Debtor contests a written directive from HUD to retain the services of a substitute operator acceptable to HUD per ¶ 26(d) of the "HUD Regulatory Agreement – Borrower," Debtor shall have thirty (30) days from receipt of such directive to: (a) notify HUD in writing that Debtor contests such directive; and (b) file a motion pursuant to Fed. R. Bankr. P. 9014 in the United States Bankruptcy Court for the District of Kansas to contest HUD's directive. If such a motion is filed, Debtor and HUD consent and agree that: (a) jurisdiction to hear and determine such motion shall lie exclusively with the U.S. Bankruptcy Court; (b) HUD has the burden of proof to establish good cause exists to remove Debtor as operator; and (c) Debtor need not retain the services of a substitute operator unless and until the United States Bankruptcy Court determines that HUD has established good cause to remove Debtor as operator.[34]

---

[34] The Court has modified subparagraph (f) in two ways. One, it requires HUD to provide the directive to debtor under § 26(d) in writing and for debtor to notify HUD in writing that

16

Debtor shall be permitted to pay from operating revenues income tax obligations incurred by Debtor, so long as such payments are made from Debtor's funds which constitute "surplus cash" as that term is defined at pp. 11-12 of the "HUD Regulatory Agreement – Borrower".

Watercrest Communities, LLC ("Watercrest"), owned by Dennis and Debie Bush, has served, and will continue to serve, as the manager of the ALF. Watercrest shall be entitled to a post-petition monthly management fee of 5% of the gross revenues of the ALF. These management fees are part of Debtor's cash flow projections attached as Exhibit 3 to the Third Amended Plan.

**(b)  Article IV Payment of Administrative Claims of the Third Amended Plan is stricken and replaced by the following:**

Cherry Creek Senior Care, LLC ("Cherry Creek") holds an administrative claim under § 503 and/or § 364 for loans made to Debtor post-filing and in the ordinary course of business, specifically: (a) a $22,989 loan to replenish the same amount previously transferred by Debtor in payment of pre-petition bankruptcy legal services and/or expenses; and (b) loans made to Debtor post-petition to pay Debtor's attorney fees and expenses, accountant fees and U.S. Trustee fees. Until such time as the Remaining HUD claim is fully paid, the claim of Cherry Creek may not be paid from Debtor's past or future operating income. Debtor shall timely pay all allowed statutory fees owed the U.S. Trustee as the same become due. There are no other administrative claims.

**(c)  The last sentence of Article V Executory Contracts & Unexpired Leases is replaced with the following sentence:**

Debtor's Plan shall reject all other unexpired lease and executory contracts. As to the Deposit Account Control Agreement by and between Debtor, Dwight, and Community National Bank & Trust dated March 30, 2020, it is only effective up to the amount of Dwight/HUD's replacement lien recognized in the Court's Order on Cash Collateral. (Dkt. 85).

Finally, the Court turns to the remaining confirmation requirements under § 1129(a)(1)-(16), except subpart (a)(8). Subparts (a)(6), (13), (14), (15), and (16) are inapplicable under the facts of this case. The Court finds that:

- the Third Amended Plan, as modified above, and the debtor have complied with the applicable provisions of Title 11 as required by § 1129(a)(1) and (2);

---

it contests the directive. Two, a contested directive will be treated as a contested matter and brought by motion under Rule 9014.

17

- the Third Amended Plan, as modified above, has been proposed in good faith and not by any means forbidden by law as required by § 1129(a)(3);

- the Third Amended Plan, as modified above, specifically Article IV, complies with § 1129(a)(4);

- the Third Amended Plan, as modified above, complies with § 1129(a)(5); it identifies Dennis and Debie Bush as the interest owners of debtor, and further identifies Watercrest Communities, LLC, also owned by Dennis and Debie Bush, as the manager of the ALF and that debtor will pay Watercrest a post-petition monthly management fee of 5% of the gross revenues;

- the Third Amended Plan, as modified above, satisfies the best interests of creditors test under § 1129(a)(7) pursuant to the Liquidation Analysis attached as Exhibit 1 to the Third Amended Plan;

- the Third Amended Plan, as modified above, complies with § 1129(a)(9);

- the Third Amended Plan, as modified above, complies with § 1129(a)(10) as two impaired non-insider classes (Class 2 and Class 3) have accepted the Third Amended Plan and thus permits cram down of the Third Amended Plan;

- the Third Amended Plan, as modified above, complies with § 1129(a)(11); the Third Amended Plan, as modified, is feasible based on debtor's cash flow projections in Exhibit 3 attached to the Third Amended Plan and is not likely to be followed by the liquidation, or need for further financial reorganization of the debtor; and

- The Third Amended Plan, as modified above, specifically Article IV, complies

with § 1129(a)(12).

Conclusion

Having concluded that debtor's Third Amended Plan, as modified and supplemented herein, complies with the applicable provisions of § 1129(a) and § 1129(b)(1) and (2)(A), the Court confirms the Debtor's Third Amended Chapter 11 Plan of Reorganization dated April 13, 2023 (Doc. 293), as modified and supplemented herein.

# # #